IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE: JANE CATHERINE COOK, Debtor           No. 5:18-bk-72190
                                                                                                Chapter 7

ORDER AND OPINION DENYING MOTION TO CONVERT OR DISMISS

On August 16, 2018, the debtor filed the above-captioned chapter 7 bankruptcy case. On November 23, 2018, creditor Bankers Healthcare Group [BHG] filed its *Motion to Convert Case to Chapter 11 or in the Alternative Dismiss, with Notice of Opportunity to Object*. On December 12, 2018, the debtor filed an objection to BHG's motion. On December 17, 2018, chapter 7 trustee Bianca Rucker filed a response to BHG's motion. The Court held a hearing that began on January 9, 2019, and concluded on March 11, 2019.[1] David Nixon appeared on behalf of the debtor; Stanley Bond and Emily Henson appeared on behalf of BHG; and Bianca Rucker appeared on her own behalf. Patti Stanley appeared on behalf of the United States Trustee but did not actively participate in the hearing. At the conclusion of the hearing, the Court took the matter under advisement. For the reasons stated below, the Court denies BHG's motion to convert or dismiss in its entirety.

**Background**

The debtor is a pediatric radiologist employed by Arkansas Children's Hospital and Sheridan Radiology. She is married and has two sons. Her older son is 23 years old and attending his final year of college; her younger son is 17 years old and still living at home. The debtor's husband is not currently employed but owns a business that allows him to contribute to household expenses on a sporadic basis. The debtor claims her

---

[1] Due to the Court's heavy docket on January 9, 2019, the parties were unable to complete the hearing as scheduled on that date. As a result, the Court continued the matter to a date to be determined and, at the parties' request, concluded the hearing on March 11, 2019.

husband and two sons as dependents. The debtor's gross income is $28,948 per month. Her bankruptcy schedules state that her monthly net income is $16,041 and her monthly expenses are $16,242–a figure that includes rent for $2750; $1300 for food and housekeeping supplies; $300 for personal care products and services; $200 for a housekeeper; and $200 for travel and vacation expenses.[2]

Prior to moving to Arkansas in 2018, the debtor lived in Florida, where she was worked as a radiologist for Sheridan Radiology, Pensacola Radiology Consultants, PA, and Orlando Hospital.[3] In January 2014, the debtor created a professional association called

---

[2] At trial, the debtor's attorney introduced drafts of amended Schedules I and J that purportedly represent updated information concerning the debtor's income and expenses. According to the amended schedules, the debtor's gross income remains $28,948 and her net income has increased to $17,891 because her husband is now contributing $1850 per month. Her monthly expenses are $19,947, resulting in a budgetary deficit of $2056. Since filing her original schedules on August 16, 2018, the debtor has rented a less expensive home that costs $1450 per month and lowered some of her utility expenses. She has also discontinued paying $200 per month for a housekeeper. However, she has other monthly expenses that have increased–for example, her expenditures for personal care products and services have increased from $300 to $447, which the debtor testified were, in her opinion, not excessive for a household of three that includes a female doctor who is required to maintain a professional appearance consistent with that of her colleagues. Food and housekeeping supplies increased from $1300 to $1350. The debtor testified that she packs her lunch almost every day but sometimes buys a snack at the hospital. Similarly, the debtor testified that she takes coffee from home to the hospital but that she sometimes purchases additional coffee during her shift in order to stay awake. She also testified that when the family eats at a restaurant–on average, once a week–they usually spend approximately $10 each. Other items have been added to her budget, including an expense of $2500 per month to repay the chapter 7 trustee the funds that she withdrew post-petition from a 529 account to pay her older son's college tuition and expenses. In addition, because the 529 account has been depleted, the debtor's monthly budget now includes an expense of $2448 for her older son's ongoing college tuition and expenses and $833 per month for savings that are earmarked to pay similar expenses for her younger son when he starts college in approximately one year.

[3] Although the record is unclear regarding the dates she worked for each entity in Florida, the debtor testified that she worked for Orlando Hospital in 2015 and 2016 and BHG's Exhibit 3 reflects that she was employed at Sheridan Radiology and Pensacola

2

Centre D'Elle, PA [the PA] for the purpose of opening a medical aesthetics spa. The debtor testified that a medical aesthetics spa (sometimes referenced as a "med spa") provides services such as medical grade chemical peels, micro-needling, and "modalities to tighten skin and reduce cellulite" such as CoolSculpting® and Z-wave machines. The debtor testified that she had planned to leave her radiology practice to perform vein procedures at the med spa once it was making enough money to allow her to quit her radiology position.

To fund the business, the PA obtained loans from BHG and Suntrust Bank [Suntrust], all of which the debtor personally and unconditionally guaranteed.[4] The med spa–Centre D'Elle–opened in July 2015. After the spa opened, the debtor continued her employment at Orlando Hospital but testified at trial that she was "very, very involved" with the med spa and used several weeks of her allotted vacation time from the hospital to work at the spa, in addition to working there on the nights and weekends that she was not at the hospital. Despite the debtor's efforts, the spa's clientele began diminishing in October 2016 and the spa was closed by December 2016. The debtor said that she found out that running a med spa was difficult, due in part to the high rate of turnover among aestheticians.

After the med spa failed, the debtor paid approximately $300,000 of her "own money" toward debts incurred by the business.[5] Trial Tr. vol II, 41, Mar. 11, 2019. The record does not reflect how much of this sum was paid to Suntrust and BHG but, in any event, both lenders threatened to file suit to collect the money owed by the PA and guaranteed by the debtor. In response, on March 31, 2017, the debtor filed a chapter 7 bankruptcy

---

Radiology Consultants, PA as of April 13, 2017.

    [4] In addition, the Small Business Administration [SBA] backed a portion of the P.A.'s indebtedness to Suntrust.

    [5] The Court presumes that when the debtor said her "own money," she was referring to income that she earned as a radiologist.

case in the Middle District of Florida, indicating on her petition that her debts were primarily business debts rather than consumer debts.[6] Cook Ex. B. In December 2017, the debtor's Florida bankruptcy case was dismissed.[7] Also in December 2017, the debtor pulled her son from Ole Miss and enrolled him in a less expensive university in Florida to cut down on her expenses. In early 2018, the debtor hired an attorney to try to negotiate settlements with Suntrust and BHG. Settlement offers were exchanged with Suntrust and BHG–to no avail–and SBA began garnishing the debtor's wages to recoup the amount that it had paid on one of the Suntrust loans. Around the same time, the debtor moved to Arkansas to begin her current position at Arkansas Children's Hospital.

On August 16, 2018, the debtor filed her current chapter 7 bankruptcy case, indicating on her Arkansas petition–as she had on her Florida petition–that her debts were primarily business debts rather than consumer debts. On November 23, 2018, BHG filed its motion to convert the debtor's case to chapter 11 pursuant to 11 U.S.C. § 706(b) or, in the alternative, dismiss her case under § 707(a) and (b). On December 12, 2018, the debtor filed an objection to BHG's motion and on December 17, 2018, the chapter 7 trustee filed her response to BHG's motion.

**Arguments of the Parties**

BHG's argument in favor of converting the debtor's chapter 7 case to a case under chapter 11 pursuant to § 706(b) is straightforward: as a doctor, the debtor has a high income and should not be allowed to rid herself of debts that she could afford to pay.

---

[6] Counsel for BHG represented in his opening statement that the debtor's Florida case was a consumer case. The Court cannot find a basis for such a representation.

[7] Although not in evidence, BHG alleged in the motion now before the Court that Suntrust moved to dismiss the debtor's Florida case and BHG joined Suntrust's motion. The parties allegedly engaged in mediation but could not reach a resolution and, as a result, the debtor consented to the dismissal of her Florida bankruptcy case on December 12, 2017. *See In re Waggoner*, 157 B.R. 433, 434 n.1 (Bankr. E.D. Ark. 1993). ("The Court may take judicial notice of the pleadings filed in a case.")

Specifically, BHG argues that if the debtor were to reduce her voluntary retirement contributions, eliminate her travel and vacation savings, cease all gift-giving, stop paying for her older son's college tuition and expenses and stop saving for her younger son's upcoming college tuition and expenses, she would have money left over each month to pay a portion of what she owes to her creditors through a chapter 11 plan. Although BHG would prefer that the debtor's case be converted to a chapter 11, BHG moved in the alternative for dismissal of her case under § 707(a), which provides that a court may dismiss a chapter 7 case "for cause," and under § 707(b), which provides that a court may dismiss a *consumer* chapter 7 case if it finds that the debtor filed her petition in bad faith or that granting relief under the chapter would constitute abuse.

The chapter 7 trustee testified that she objects to the dismissal of the debtor's case because she has recovered assets that will result in a distribution to the debtor's creditors and she has not concluded her investigation into the debtor's affairs. Specifically, the trustee testified that the debtor has already turned over to her $44,991; she and the debtor are in the process of negotiating a buyback agreement for an additional $40,000; and the trustee has in her possession CoolSculpting® cartridges that she plans to sell for approximately $500 each and a Z-wave machine that she is already in the process of selling for $5000. In addition, the trustee testified that she intends to investigate and, if appropriate, pursue the recovery of pre-petition transfers made to the debtor's adult child and his university. The trustee opposes conversion of the debtor's case to a chapter 11 unless a trustee is appointed upon conversion, because, despite the debtor's cooperation with her thus far, she does not believe that the debtor, a busy doctor, would be an effective fiduciary for her creditors.

The debtor argues that the Court should not exercise its discretion to convert her chapter 7 case to chapter 11 under § 706(b) because she would not benefit from the conversion and, in any event, she believes that she would be unable to fund a plan because she has already minimized her expenses as much as she can and she believes she is obligated to

pay for her sons' college tuition and expenses.[8] She also argues that there is no cause to dismiss her case under § 707(a) and that her case is not subject to dismissal under § 707(b) because she has primarily business debts and § 707(b) applies only in consumer cases.[9]

**Findings of Fact & Conclusions of Law**

BHG seeks to prevent the debtor from obtaining chapter 7 relief under three code provisions: § 706(b), § 707(a), and § 707(b). Although conversion under § 706(b) and dismissal under § 707(a) are potentially applicable in all chapter 7 cases, dismissal under § 707(b) is restricted to chapter 7 cases in which the debtor has primarily consumer debts. 11 U.S.C. § 707(b)(1) ("the court . . . may dismiss a case filed by an individual debtor under this chapter *whose debts are primarily consumer debts* . . . .") (emphasis added). Therefore, the Court must determine whether the debtor in this case has primarily consumer or non-consumer debts before proceeding with its analysis. Consumer debt is defined as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). "Consumer debt can be both secured and unsecured debt." *Cox v. Fokkena* (*In re Cox*), 315 B.R. 850, 855 (B.A.P. 8th Cir. 2004) (citing *Zolg v. Kelly* (*In re Kelly*), 841 F.2d 908, 912 (9th Cir. 1988)). To determine whether a debt should be classified as a consumer debt, courts examine the debtor's "purpose in incurring it." *Lapke v. Mutual of Omaha Bank* (*In re Lapke*), 428 B.R. 839, 843 (B.A.P. 8th Cir. 2010). If a debt does not involve a "business transaction or potential profit motive" then it is generally categorized as a consumer debt. *In re Palmer*, 117 B.R. 443, 446 (Bankr. N.D. Iowa 1990).

---

[8] The debtor testified that she believes that she was ordered to pay for her sons' college educations when she and their father divorced.

[9] On January 8, 2019, the debtor filed a *Motion for Sanctions* against BHG based upon her allegation that BHG acknowledged in its motion to convert or dismiss that the debtor's debts are *not* primarily consumer debts yet nonetheless moved for dismissal under § 707(b) in the same pleading.

In this case, the Court finds that the debtor has $431,666 in consumer debt[10] and $1,071,312 in non-consumer debt comprised of business debt in the amount of $949,212[11]; a domestic support obligation owed to the debtor's ex-husband in the amount

---

[10] The Court's calculation of the debtor's consumer debts includes the secured debts owed to Bank of America ($6555) and Ditech Financial, LLC ($68,701) that were incurred by the debtor in relation to property located at 1308 N. 9th Avenue, Iron River, Michigan based on the debtor's testimony that she purchased the property because she intended to live there, despite the fact that she later entered into a contract for deed to sell the property. Trial Tr. vol II, 44-45. *See In re Cox*, 315 B.R. at 854-55 (affirming the bankruptcy court's characterization of a debt as a consumer debt based on the debtors' testimony that they intended to reside in a home at the time they incurred the debt to build it, irrespective of their plan to sell the home for a profit in the future). Based on the debtor's unrebutted testimony, the Court also included in this calculation the secured debts owed by the debtor to Harvesters Federal Credit Union ($26,166 owed on the debtor's current vehicle) and MSU Federal Credit Union ($172,589 owed at the time of filing on a recreational vehicle that the debtor has since surrendered); and unsecured debts owed to ADT Security Services ($488); Amex ($500); Citibank ($1058, based on the debtor's testimony that 10% of the $10,580 debt owed to Citibank was incurred for personal items); Ford Credit ($2392, based on debtor's testimony that 50% of the $4784 debt owed to Ford Credit was personal) and student loans owed to AES ($153,217). *See In re Stewart*, 201 B.R. 996, 1005 (Bankr. N.D. Okla. 1996), *aff'd*, 215 B.R. 456 (B.A.P. 10th Cir. 1997), *aff'd*, 175 F.3d 796 (10th Cir. 1999) (finding that "student loans in general should be treated as 'consumer debt', at least absent unusual facts or factors of which this Court is not presently aware.")

[11] The Court's calculation of the debtor's business debt includes the unsecured debts owed to Bank of America ($13,267) and Ditech Financial, LLC ($72,271) arising from the short sale of the debtor's cabin located at 645 Sunset Lake Road in Michigan based upon her testimony that she purchased the cabin to use primarily as rental property. Trial Tr. vol II, 49. *See James v. West* (*In re West*), Adv. No. 16-04083-can, 2017 WL 746250, at *6 (Bankr. W.D. Mo. Feb. 24, 2017) (debts incurred for "business ventures or other profit-seeking activities" are not consumer debts). Based upon the debtor's uncontroverted testimony and information gleaned from her schedules, the Court also categorized as business debts: 1st Data ($553); ADT Security Services ($400); Allergan ($6458); Allied Insurance ($2000); Ascentium Capital ($16,210); Bank of America (7423); BHG ($228,293); Citibank ($9522, based on debtor's testimony that 90% of the $10,580 debt owed to Citibank was due to business purchases); Ford Credit ($2392, based on debtor's testimony that 50% of the $4784 debt owed to Ford Credit was business related); Genesis ($1000); Graybar Financial Services ($2572); Herron Hill Law Group ($800); Jarold Horton ($3320); MSU Federal Credit Union ($4184 and $14,534); Penn Station ($30,000); Phil Calandrino ($2484); Scentair Technologies ($2432);

7

of $112,500; and county property taxes incurred in relation to the med spa in the amount of $9600.[12] Therefore, despite BHG's unsupported–yet puzzlingly steadfast–contention that the debtor has primarily consumer debt, the Court finds that the debtor has primarily non-consumer debt.[13] As a result, the Court denies BHG's motion to dismiss under § 707(b) and will address BHG's remaining two bases for conversion and dismissal below.

---

Suntrust ($384534 and $12811); SBA ($131152); and Valerie Joseph ($600).

[12] The debtor's domestic support obligation is current and the Court has no evidence that the county taxes are delinquent. In addition to the debts already discussed, the debtor scheduled a $250,000 claim stemming from a medical malpractice suit filed against her in Florida. During the hearing, the debtor testified that she erroneously listed the debt twice in her schedules but clarified that she has only one claim against her in that amount. In any event, the Court did not include the $250,000 medical malpractice debt in its calculation of the debtor's consumer or non-consumer debts because the debtor testified that she believed that she had been dropped from the lawsuit. However, in the event that the debtor was mistaken about the status of the lawsuit and the $250,000 should have been taken into consideration, adding that amount to either category of debt (consumer or non-consumer) would not have changed the Court's determination that the debtor has primarily non-consumer debt–and would probably have bolstered the Court's conclusion that the debtor has more non-consumer debt. *See In re White*, 49 B.R. 869, 872 (Bankr. W.D.N.C. 1985) (a debt arising from the debtor's negligence is not a consumer debt because consumer debts must be voluntarily incurred).

[13] BHG's counsel represented to the Court in both his opening statement and his closing argument that the debtor has primarily consumer debts but he failed to introduce any evidence to support that contention. Instead, counsel for BHG argued that BHG had no choice but to rely on the information contained in the debtor's schedules–information that he characterized as ambiguous and lacking specificity about the nature of the debtor's debts. The Court disagrees. First of all, the debtor indicated on page six of her petition that she had primarily business rather than consumer debts–just as she had done previously in Florida–a case in which BHG was also involved. Second, while it is true that some of the debtor's debts could not have been accurately classified without the aid of the debtor's testimony, that does not hold true for all of them. In particular, the Court directs BHG's counsel to Schedule H: Your Codebtors, where the debtor tied her business, Centre D'Elle, PA, to twenty-one specific debts listed elsewhere in her schedules totaling almost $1,000,000. The Court finds that the debtor's petition and schedules provided enough information to allow BHG–itself the holder of a substantial business debt–to infer that the debtor had scheduled primarily business debts.

**Conversion under § 706(b)**

Section 706(b) provides that "[o]n request of a party in interest and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 11 of this title at any time."  11 U.S.C. § 706(b).  The movant–in this case, BHG–bears the burden of showing grounds for conversion to chapter 11 pursuant to § 706(b).  *In re Mercurial*, No. 17-00144, 2017 WL 6001682, *2 (Bankr. N.D. Iowa Dec. 1, 2017).  "[T]he decision whether to convert [under § 706(b)] is left in the sound discretion of the court, based on what will most inure to the benefit of all parties in interest."  *Schlehuber v. Fremont Nat'l Bank & Trust* (*In re Schlehuber*), 489 B.R. 570, 573 (B.A.P. 8th Cir. 2013) (citations omitted).  The

> directive to examine the "benefit to all parties in interest" suggests not an inquiry solely into the best interests of the creditors, or even the best interests of the estate, but rather a broader inquiry into what will collectively benefit the debtor, the creditors, and any other parties with a stake in the case.

*In re Karlinger-Smith*, 544 B.R. 126, 131 (Bankr. W.D. Tex. 2016).

Because § 706(b) provides no guidance regarding the factors pertinent to deciding whether a case should be converted, courts "should consider anything relevant that would further the goals of the Bankruptcy Code."  *In re Schlehuber*, 489 B.R. at 573 (citations omitted).  However, this Court recognizes–as other courts have–that the "goals of the Bankruptcy Code" inherently conflict because "creditors seek to maximize their recovery [while] debtors understandably seek to discharge their debts as quickly as possible in furtherance of their fresh start."  *In re Decker*, 535 B.R. 828, 837-38 (Bankr. D. Alaska 2015).  BHG correctly pointed out in its motion to convert or dismiss that § 706(b) does not require, on its face, the application of a balancing test.  Nonetheless, courts have historically considered the parties' "competing interests in furtherance of responsibly exercising their discretion."  *Id*. at 838.

In analyzing whether to convert a chapter 7 case to a case under chapter 11, courts generally begin by deciding whether the debtor has sufficient disposable income to fund

9

a chapter 11 plan. *In re Baker*, 503 B.R. 751, 757 (Bankr. M.D. Fla. 2013) (citing *In re Schlehuber*, 489 B.R. at 574 (the debtor's ability to fund a chapter 11 plan is "'an important and relevant consideration' under § 706(b)."); *see also In re Parvin*, 538 B.R. 96, 102 (Bankr. W.D. Wash. 2015) (the debtor's ability to pay is the logical starting point for a § 706(b) analysis because "the whole reason for asking [for] a case to be converted is the assumption that creditors would receive more in a chapter 11 than a chapter 7.")

In the instant case, the debtor's updated drafts of Schedules I and J reflect that she has a monthly budgetary deficit of $2056–indicating that the debtor could not fund a chapter 11 plan. However, BHG argues that the debtor's budget contains expenses that are inappropriate for a chapter 7 debtor to include, such as voluntary contributions made to her 401(k) and 403(b) accounts, gift-giving expenses, an allotment for travel and vacation, as well as what BHG deems excessive expenditures for food and personal care products and services. BHG contends that these voluntary wage deductions and unnecessarily high expenditures, including those related to her older son's college tuition and expenses and the monthly savings directed toward her younger son's similar future expenses, should be reduced or eliminated to bring her budget more closely in line with the national standards published by the IRS. According to BHG, if the debtor were compelled to adjust her budget, she would have sufficient disposable income to fund a five-year chapter 11 plan, resulting in a larger dividend to her creditors than they would receive if the debtor remained in her chapter 7 case.

The Court agrees that if the debtor were forced to reduce or eliminate expenses from her budget that exceed the IRS guidelines and she was prevented from paying for her sons' respective college educations–an action that, according to the debtor's undisputed testimony, may well be in violation of a state court order–then the debtor could fund a chapter 11 plan that would result in a larger dividend to creditors than they would receive in a chapter 7 case. However, although conversion to chapter 11 would benefit creditors in theory, the Court cannot say with certitude that conversion would benefit creditors in reality, as discussed below.

Although BHG accurately asserted in its motion to convert or dismiss that plan confirmation is not an issue to be decided in the context of a motion to convert under § 706(b), it is appropriate for the Court to consider the likelihood that the debtor will be able to propose a confirmable plan. *See In re Parvin*, 538 B.R. at 102. Here, the Court finds it unlikely that the debtor would be able to propose a confirmable plan in the light of the fact that the debtor tried and failed to negotiate a settlement with BHG several times–before she filed bankruptcy in Florida, during a mediation conducted *during* her bankruptcy case in Florida, and again before she filed her current bankruptcy case in Arkansas. Against the backdrop of the parties' historical inability to come to a mutually satisfactory resolution, the Court finds it improbable that BHG would accept any plan proposed by the debtor unless she made the significant alterations to her budget that BHG insists upon and the debtor testified that she cannot make. As a result, if the debtor's case were converted to one under chapter 11, the Court finds it more likely than not that additional litigation between BHG and the debtor would impede or completely obstruct the confirmation of a plan–leading the debtor to seek dismissal or reconversion of her case to one under chapter 7, all of which would take time, result in added expense to the parties, and ultimately delay payment not only to BHG but to all creditors. For these reasons, the Court finds that it is not necessarily in the best interest of creditors to convert the case to one under chapter 11.

In any event, the debtor's ability to pay into a chapter 11 plan is not, by itself, determinative under § 706(b). *In re Decker*, 535 B.R. at 840. The Court must also examine whether conversion would benefit the debtor. *See In re Karlinger-Smith*, 544 B.R. at 133-34 (conversion under § 706(b) must afford some benefit to the debtor "however small or intangible.") Courts generally find a benefit to the debtor–irrespective of the debtor's opposition to conversion–when the debtor has significant unresolved tax liabilities, domestic support arrearages, or other non-dischargeable debts that would survive a chapter 7 discharge but could be addressed through a chapter 11 plan. *See id.*; *see also In re Decker*, 535 B.R. at 839 and *In re Baker*, 503 B.R. at 758. In those types of debt scenarios, "conversion may not give Debtors immediate relief, but could

11

ultimately result in a better fresh start." *In re Decker*, 535 B.R. at 843. In the instant case, however, the debtor has no tax debt–other than $9600 owed for county property taxes–she is current on her domestic support obligation, and presently has no other non-dischargeable debts that could be more effectively addressed within the context of a chapter 11.[14] As a result, the Court finds that conversion to a chapter 11 would be of no benefit to the debtor and would instead only transfer some of her future income to her creditors. *See In re Karlinger-Smith*, 544 B.R. at 134. If the debtor's disposable income was diverted to creditors against her will, it is unlikely that the debtor would be motivated to maintain her current work load–and by extension, her current level of income. *See id.* Although § 706(b) provides a statutory mechanism for a court to convert a case to chapter 11 without the debtor's consent, "it would be a poor exercise of discretion not to take a lack of benefit to the debtor–and concomitant lack of incentive–into consideration." *Id.*

For all of the above stated reasons–including the unfavorable prospects for plan confirmation; the likelihood that the debtor would attempt to reconvert her case to a chapter 7 or dismiss it completely; the probability that the chapter 7 trustee's distribution to creditors would be delayed in the event of conversion due to the litigation that would almost certainly ensue in a chapter 11; the expense of that litigation to all parties; and the fact that conversion would not benefit the debtor in any discernible way–the Court declines to exercise its discretion to convert the debtor's case pursuant to § 706(b). Therefore, the Court denies BHG's motion to convert.

---

[14] The chapter 7 trustee has filed a motion to extend her deadline for filing an objection to discharge because she is attempting to minimize expense to the estate until the Court rules on BHG's motion to convert or dismiss. However, the Court has not yet ruled on that motion and the deadline for other parties to object to discharge or dischargeability has expired.

**Dismissal under § 707(a)**

Section 707(a) provides that

> a court may dismiss a case under this chapter only after notice and a hearing and only for cause, including–
> (1) unreasonable delay by the debtor that is prejudicial to creditors;
> (2) nonpayment of any fees or charges required under chapter 123 of title 28: and
> (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on motion of the United States Trustee.

11 U.S.C. § 707(a). The statute does not define the term "'cause,' beyond setting forth three specific examples.'" *Huckfeldt v. Huckfeldt* (*In re Huckfeldt*), 39 F.3d 829, 831 (8th Cir. 1994). However, "the introductory word 'including' means that these three types of 'cause' are nonexclusive." *Id.* (citation omitted). The decision to dismiss under § 707(a) "lies within the discretion of the bankruptcy judge." *In re Timmerman*, 379 B.R. 838, 845 (Bankr. N.D. Iowa 2007).

In its motion to convert or dismiss, BHG stated that "[t]he Eleventh Circuit has unequivocally ruled that a bad faith filing constitutes 'cause' for dismissal." BHG then enumerated a list of factors used by courts in the Eleventh Circuit to determine bad faith under § 707(a). During his closing argument, debtor's counsel also cited to Eleventh Circuit precedent, in apparent agreement with BHG that the Eleventh Circuit's analysis applies in this case. However, the Eighth and Eleventh Circuits do not subscribe to the same approach to bad faith under § 707(a). The Eleventh Circuit employs a "less restrictive approach to § 707(a) dismissal" than the approach adopted by the Eighth Circuit. *In re Bushyhead*, No. 13-12897-M, 2016 WL 11263627, *4-5 (Bankr. N.D. Okla. May 25, 2016) (discussing various circuits' respective approaches to bad faith under § 707(a)). The Eighth Circuit applies a "narrow, cautious approach to bad faith" in relation to § 707(a), limiting bad faith under this subsection to "extreme misconduct falling outside the purview of more specific Code provisions, such as using bankruptcy as

13

a 'scorched earth' tactic against a diligent creditor, or using bankruptcy as a refuge from another court's jurisdiction." *In re Huckfeldt*, 39 F.3d at 832 (adopting the approach to bad faith under § 707(a) as set forth in *In re Kahn*, 172 B.R. 613 (Bankr. D. Minn. 1994)). In this case, the Court has no evidence that the debtor has engaged in the type of "extreme misconduct" that would fall under the Eighth Circuit's narrow definition of bad faith under § 707(a).[15]

In support of dismissal under § 707(a), BHG argues, again, that the debtor's high income affords her the ability to pay her creditors a significant portion of what she owes them and that her ability to pay is sufficient cause to dismiss her case under § 707(a). Although other jurisdictions–the Eleventh Circuit, for instance–may consider the debtor's ability to pay in the context of dismissal under § 707(a), the Eighth Circuit recognizes that a debtor's "ability to pay is *not* cause for dismissal under § 707(a)." *In re Huckfeldt*, 39 F.3d at 832 (emphasis added) (citing *In re Goulding*, 79 B.R. 874, 876 (Bankr. W.D. Mo. 1987)). For these reasons, the Court finds that BHG did not establish cause to dismiss the debtor's case pursuant to § 707(a). Therefore, the Court denies BHG's motion to dismiss.

---

[15] Because both parties cited the factors considered in the Eleventh Circuit, the Court notes that it would have denied BHG's motion to dismiss under Eleventh Circuit law, too–the record reflects that the debtor has tried to lower her expenses by moving to a less expensive home and moving her son to a less expensive university; there is no evidence that the debtor is living a lavish lifestyle–she drives a Subaru, packs her lunch for work, and lives in a rental home; she adequately explained the few inaccuracies contained in her schedules; the record reflects that she attempted to repay her debts–she testified that she paid her business creditors at least $300,000 and she repeatedly tried to negotiate settlements with her creditors; she has a number of creditors and did not file bankruptcy to avoid a single, large debt; although the debtor's expenses are high, there is no evidence that they are not accurate; there is likewise no evidence the debtor has failed to disclose her assets or otherwise make full and candid disclosures to the Court; and the debtor's debts are not "modest in relation to [her] assets and income"–although she earns approximately $340,000 per year, she owes over $1.5 million. *See In re Piazza*, 719 F.3d 1253, 1261 (11th Cir. 2013) (citing factors considered under § 707(a) in the Eleventh Circuit).

**Conclusion**

For all of the above-stated reasons, the Court denies BHG's motion to convert or dismiss. The Court finds that the debtor may proceed in her case under chapter 7. The Court will hear the debtor's *Motion for Sanctions* against BHG on June 5, 2019, at 9:00 a.m., in the United States Bankruptcy Court, Fayetteville Division.

IT IS SO ORDERED.

                                                                                Ben Barry
                                                                                United States Bankruptcy Judge
                                                                                Dated: 05/02/2019

cc:     David Nixon, attorney for debtor
         Stanley Bond & Emily Henson, attorneys for BHG
         Bianca Rucker, chapter 7 trustee
         United States Trustee